POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY BUCHHEIM and BRYAN FOAT, derivatively on behalf of Nominal Defendant ANAPTYSBIO, INC., | Case No. **'21 CV 0766 L    BGS** |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiffs, | |
| | JURY TRIAL DEMANDED |
| v. | |
| DENNIS FENTON, LAURA J. HAMILL, HOLLINGS RENTON, JOHN P. SCHMID, HAMZA SURIA, JAMES N. TOPPER, J. ANTHONY WARE, JAMES SCHOENECK, NICHOLAS B. LYDON, CAROL GALLAGHER, MARCO LONDEI, and DOMINIC G. PISCITELLI, | |
| Defendants, | |
| and | |
| ANAPTYSBIO, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Gary Buchheim and Bryan Foat (collectively, "**Plaintiffs**"), by and through their undersigned attorneys, submit this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiffs allege the following upon information and belief, except as to the allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**"), a review of news reports, press releases, and other publicly available sources, and the review of books and records produced by the Company in response to Plaintiffs' separate, respective demands made under 8 *Del. C.* § 220 (the "**Section 220 Demands**") as to all other matters, all of which books and records are expressly incorporated by reference into this Complaint. For the avoidance of doubt, this incorporation by reference does not change the pleading standard applicable to any motion to dismiss that may be filed in this case.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs bring this stockholder derivative action on behalf of AnaptysBio against certain current and/or former members of the Company's Board of Directors (the "**Board**") and certain executive officers of AnaptysBio to remedy their breaches of fiduciary duties, insider trading, unjust enrichment, and waste of

1

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

corporate assets. These wrongs have resulted in millions of dollars in damages to AnaptysBio's reputation, goodwill, and standing in the community. Moreover, these actions have exposed AnaptysBio to millions of dollars in potential liability.

2.     AnaptysBio is a clinical stage biotechnology company focused on the discovery and development of therapeutic antibodies for the treatment of inflammatory diseases and cancers. Its drug etokimab, formerly one of the Company's lead drug assets, which is also known as ANB020, is a therapeutic antibody intended to treat various inflammatory diseases.

3.     In 2017, AnaptysBio began testing the efficacy of etokimab in various clinical trials for the treatment of inflammation disorders including atopic dermatitis, peanut allergy, and asthma. From October 10, 2017 to November 7, 2019 (the "**Relevant Period**"), the Individual Defendants[1] touted the drug's efficacy and prospects for the treatment of both atopic dermatitis and peanut allergy.

4.     The Individual Defendants consistently touted purportedly positive trial results as providing a solid foundation for the continued development of etokimab to treat various maladies. Specifically, the Individual Defendants indicated that their Phase 2a trials for both atopic dermatitis and peanut allergy demonstrated proof-of-concept for etokimab in treating those specific inflammatory conditions.

---

[1] The "Individual Defendants" are defined below at ¶ 41.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.     The Individual Defendants, however, failed to disclose key information learned from trials and applied questionable analysis, which rendered the trial results regarding etokimab's purported efficacy and its prospects for supporting further development efforts appear far better than they were.

6.     On March 26, 2018, the Individual Defendants announced data from the Company's interim analysis of its etokimab adult peanut allergy phase 2a study. Although the Individual Defendants reported improvement among patients that received a single dose of etokimab compared to patients dosed with a placebo, the Individual Defendants misleadingly concealed that these professed results were possible only because the Company had excluded 20% of the enrolled trial patients, possibly after the interim results had been calculated.

7.     Later that day, an analyst from RBC Capital Markets ("**RBC**") issued a report (the "**March RBC Report**") casting doubt on management's credibility based on the Company's disclosure of interim data from its Phase 2a peanut allergy trial that RBC considered "challenging to interpret" due to a "lack of disclosure" from AnaptysBio. The March RBC Report also questioned the propriety of the trial design.

8.     On this news, the price of AnaptysBio common stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9.      Nevertheless, the Individual Defendants continued to promote the "pretty profound efficacy" of etokimab, creating the public impression that the Company's trials of etokimab as a treatment for peanut allergy were moving forward.

10.     On April 4, 2018, the same RBC analyst issued another report (the "**April RBC Report**"), this time downgrading the Company's stock and reducing the price target to $86 per share from $144 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility." Significantly, in preparing the April RBC Report, the analyst consulted a physician with an expertise in peanut allergies. The consultant concluded that the Company's patient subgrouping and subgroup analysis based on symptomology to peanut doses (*i.e.*, mild, moderate, and severe patients) did not exist in the industry and, even if they did, were "statistically questionable."

11.     In response, the price of AnaptysBio common stock dropped once again, from $94.35 per share on April 4, 2018, to close at $87.32 per share on April 5, 2018, a drop of approximately 7.5%.

12.     On August 7, 2018, AnaptysBio announced that it had abandoned its efforts to obtain clinical approval of etokimab as a treatment for peanut allergy, purportedly because of a "market assessment," and that it would not pursue a Phase 2b clinical trial.

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13.    Despite abandoning its etokimab peanut allergy trials premised on a "market assessment," the Individual Defendants continued to tout the efficacy of etokimab as a treatment for atopic dermatitis, suggesting that the Phase 2a trial for that indication had exceeded its goal "quite robustly" and again indicating that the trial results supported further clinical development of the drug.

14.    On June 21, 2019, an analyst from Credit Suisse issued a report (the "**Credit Suisse Report**") questioning the veracity of the data from the Company's Phase 2a atopic dermatitis trial. The Credit Suisse Report stated that the Company's decisions regarding the study could "chang[e] the interpretation of the data as it relates to the overall prospects of the asset."

15.    On this news, the price of AnaptysBio common stock declined nearly 12%, from $67.02 per share on June 20, 2019, to close at $59.24 per share on June 21, 2019.

16.    Although the Individual Defendants continued to stand by their misrepresentations about etokimab for several months after the Credit Suisse Report was published, on November 8, 2019, the Individual Defendants announced "very disappoint[ing]" data from the Company's Phase 2b etokimab trial.

17.    When the truth concerning etokimab's inability to demonstrate clinical efficacy was ultimately disclosed to the public, the price of AnaptysBio common

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock plummeted nearly 72%, from a closing price of $36.16 per share on November 7, 2019 to a closing price of $10.18 on November 8, 2019.

18.     The Individual Defendants, however, fared far better than the Company (or its stockholders). As detailed below, while the price of the Company's stock was artificially inflated during the Relevant Period, multiple AnaptysBio insiders began selling their AnaptysBio stock at alarming rates, collectively reaping almost *$21.7 million.* These sales occurred while the insiders were in possession of material, adverse, non-public information.

19.     As detailed herein, and as alleged in the ongoing federal securities class action in the Southern District of California, styled *In re AnaptysBio, Inc. Securities Litigation,* Case No. 3:20-cv-00565 (the "**Federal Securities Class Action**"), AnaptysBio's officers and directors substantially damaged the Company by issuing a series of false and misleading statements that omitted material adverse facts regarding etokimab.

20.     Accordingly, Plaintiffs bring this action against the Individual Defendants to repair the harm that they have caused to the Company.

## II.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. §

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

23.     This Court has personal jurisdiction over each of the Individual Defendants because each Defendant is either a corporation incorporated in this District or is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Individual Defendants have received substantial compensation in this District by engaging in various activities that had an effect in this District. Venue is proper in this District because the Company and the Individual Defendants have conducted business in this District and Individual Defendants' actions have had an effect in this District.

## III.   **PARTIES**

**Plaintiffs**

25.     Plaintiff Gary Buchheim is a current stockholder of and has continuously held AnaptysBio common stock during the Relevant Period.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26.     Plaintiff Bryan Foat is a current stockholder of AnaptysBio common stock and has continuously held AnaptysBio common stock since October 2017.

**Nominal Defendant**

27.     AnaptysBio is a clinical stage biotechnology company incorporated in Delaware. The Company maintains its principal executive offices at 10421 Pacific Center Court, Suite 200, San Diego, California. The Company's common stock trades on the NASDAQ, under the ticker symbol "ANAB."

**Current Director Defendants**

28.     Defendant Dennis Fenton ("**Fenton**") has served as a member of the Board since March 2018. He served on the Audit Committee during the Relevant Period. Defendant Fenton currently serves as the Chairperson of the Compensation Committee and Research and Development Committee. He received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2018 | $54,586 | $835,714 | $890,300 |
| 2019 | $67,500 | $251,486 | $318,986 |

29.     Defendant Laura J. Hamill ("**Hamill**") has served as a member of the Board since September 2019. Defendant Hamill also currently serves on the Audit Committee and Compensation Committee. She received the following compensation during the Relevant Period:

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2019 | $11,114 | $193,132 | $204,246 |

30.     Defendant Hollings Renton ("**Renton**") has served as a Company director since June 2015. Defendant Renton is currently the Chair of the Nominating and Corporate Governance Committee. Renton received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $66,285 | $211,880 | $278,165 |
| 2018 | $67,500 | $383,929 | $451,429 |
| 2019 | $67,500 | $251,486 | $318,986 |

31.     Defendant John P. Schmid ("**Schmid**") has served as a director of the Company since June 2015. He is currently a member of the Compensation Committee and Chairperson of the Audit Committee. Schmid received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $53,958 | $211,880 | $278,165 |
| 2018 | $55,000 | $383,929 | $438,929 |
| 2019 | $59,472 | $251,486 | $310,958 |

32.     Defendant Hamza Suria ("**Suria**") joined the Company in 2008, and has served as President and Chief Executive Officer ("**CEO**") and a director of the

9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company since 2011. As alleged herein, during the Relevant Period, defendant Suria reaped over $12 million in total proceeds from sales of nearly 170,000 shares of Company stock over a span of only about 6 months. In doing so, defendant Suria liquidated almost his entire position in AnaptysBio. Suria received the following compensation during the Relevant Period:

| Fiscal Year | Salary | Bonus/Non-Equity Incentive Plan | Options | All Other Compensation | Total Compensation |
|---|---|---|---|---|---|
| 2017 | $465,000 | $209,250 | $3,341,588 | $600 | $4,016,438 |
| 2018 | $547,000 | $270,765 | $4,303,927 | $540 | $5,122,232 |
| 2019 | $567,000 | $0 | $7,301,646 | $6,540 | $7,875,186 |

33.     Defendant James N. Topper ("**Topper**") has served as a director of the Company since November 2007. He is currently a member of the Nominating and Corporate Governance Committee and the Research and Development Committee. Topper received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $64,670 | $211,880 | $276,550 |
| 2018 | $68,750 | $383,929 | $452,679 |
| 2019 | $68,750 | $251,486 | $320,236 |

34.     Defendant J. Anthony Ware ("**Ware**") has served as a director of the Company since August 2017. He is currently a member of the Research and Development Committee, the Audit Committee, and the Nominating and Corporate

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Governance Committee. Ware has received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $19,280 | $472,511 | $491,791 |
| 2018 | $61,167 | $383,929 | $445,096 |
| 2019 | $66,250 | $251,486 | $317,736 |

**Former Director Defendants**

35.     Defendant James Schoeneck ("**Schoeneck**") served as a director of the Company from November 2015 until he resigned in March 2018. He received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $52,500 | $211,880 | $264,380 |
| 2018 | $13,486 | $383,929 | $397,415 |

36.     Defendant Nicholas B. Lydon ("**Lydon**") served as a director of the Company from November 2005 until he resigned in June 2019. He reaped approximately $2.8 million in total proceeds from insider sales during the Relevant Period. Lydon received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $55,347 | $211,880 | $267,227 |
| 2018 | $55,000 | $383,929 | $438,929 |

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 2019 | $24,629 | $251,486 | $276,115 |

37.     Defendant Carol Gallagher ("**Gallagher**") served as a director of the Company from October 2011 until she resigned in March 2018. She received the following compensation during the Relevant Period:

| Fiscal Year | Fees | Options | Total Compensation |
|---|---|---|---|
| 2017 | $59,124 | $211,880 | $271,004 |
| 2018 | $10,222 | $383,929 | $394,151 |

**Officer Defendants**

38.     Defendant Marco Londei ("**Londei**") served as the Company's Chief Medical Officer ("CMO") from October 2016 until March 25, 2020.  Prior to that, defendant Londei served as the Company's Chief Development Officer from October 2014 until October 2016.  As alleged herein, Londei reaped over $4 million in total proceeds from sales of Company stock – over 73% of his position in AnaptysBio – during the same time period that defendant Suria made his insider sales challenged herein. He received the following compensation during the Relevant Period:

| Fiscal Year | Salary | Bonus/Non-Equity Incentive Plan | Options | All Other Compensation | Total Compensation |
|---|---|---|---|---|---|
| 2017 | $395,250 | $117,982 | $1,633,665 | $3,960 | $2,150,857 |
| 2018 | $436,000 | $161,320 | $1,912,856 | $3,564 | $2,513,740 |

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 2019 | $453,000 | $108,720 | $2,527,242 | $9,564 | $3,098,526 |

39.     Defendant Dominic Piscitelli ("**Piscitelli**") served as the Company's Chief Financial Officer ("CFO") from January 2017 until September 9, 2019. As alleged herein, in December 2018, defendant Piscitelli reaped approximately $2.5 million in total proceeds by selling his entire position in the Company on a single day.  He received the following compensation during the Relevant Period:

| Fiscal Year | Salary | Bonus/Non-Equity Incentive Plan | Options | All Other Compensation | Total Compensation |
|---|---|---|---|---|---|
| 2017 | $356,811 | $211,143 | $2,290,041 | $13,253 | $2,871,248 |
| 2018 | $397,000 | $146,890 | $1,571,275 | $540 | $2,115,705 |
| 2019 | $310,858 | $0 | $1,538,226 | $6,574 | $1,855,658 |

**Non-Party Director**

40.     Magda Marquet ("**Marquet**") has served as a director of the Company since January 2021. She is a member of the Audit Committee.

41.     Collectively, defendants Fenton, Gallagher, Hamill, Londei, Lydon, Piscitelli, Renton, Schmid, Schoeneck, Suria, Topper, and Ware are referred to herein as the "**Individual Defendants**."

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## IV.   <u>SUBSTANTIVE ALLEGATIONS</u>

### A.   **Background of AnaptysBio & etokimab**

42.   AnaptysBio is a San Diego-based clinical stage biotechnology company, founded in 2005, which focuses on the discovery and development of therapeutic antibodies for the treatment of inflammatory diseases and cancers. According to the Company's public filings, it develops product candidates using its proprietary antibody discovery technology platform, which is designed to replicate *in vitro* the natural process of antibody generation by incorporating the cellular mechanism of somatic hypermutation ("**SMH**")—the human body's natural process of antibody generation.

43.   Etokimab is a therapeutic antibody intended to treat various inflammatory diseases. Beginning in 2017, the Company proceeded to test the efficacy of etokimab in various clinical trials for several inflammation disorders including atopic dermatitis, peanut allergy, and asthma.

44.   Throughout the Relevant Period, the Individual Defendants touted the drug's efficacy and prospects for the treatment of both atopic dermatitis and peanut allergy. However, the Individual Defendants failed to disclose key information from the trials and used questionable analysis which made the trial results regarding etokimab's efficacy and its prospects appear far better than they were.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

45.     Throughout the Relevant Period, the Individual Defendants issued press releases, financial statements, and held conference calls which contained materially false and misleading information regarding: (1) the Company's retrospective exclusion of 20% of the patients enrolled in the peanut allergy study from the interim analysis due to their mild symptoms; (2) the classification of certain patients using topical corticosteroids as a rescue therapy during the atopic dermatitis study as "responders" per the study's endpoints; and (3) the ability of the Company to begin Phase 2b trials based upon the results achieved in Phase 2a.

**B.      The Individual Defendants Issue False and Misleading Statements Touting the Efficacy of Etokimab in Treating Atopic Dermatitis**

46.     On October 10, 2017, the Individual Defendants issued a press release that provided an interim analysis of its Phase 2a clinical trial of etokimab for the treatment of atopic dermatitis (the "**Phase 2a AD Trial**").[2]

47.     According to the press release, the Phase 2a AD Trial enrolled 12 adult patients with moderate-to-severe atopic dermatitis. Each trial participant was initially administered a single intravenous dose of a placebo within 14 days of enrollment, followed by a single intravenous 300mg dose of etokimab one week after receiving the placebo. Clinical response was reportedly assessed by measuring the improvement of each patient's Eczema Area Severity Index ("**EASI**") score

---

[2]   https://ir.anaptysbio.com/news-releases/news-release-details/anaptysbio-reports-positive-topline-proof-concept-data-phase-2a.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

relative to their baseline score at key time points after receiving the etokimab dose. The primary efficacy objective of this study was to demonstrate a least an EASI-50 response (50% or better improvement in EASI score relative to enrollment baseline) in at least half of the patients at 29 days after receiving a dose of etokimab.

48. In the October 10, 2017 press release detailing the interim analysis, defendant Suria stated that AnaptysBio was "very encouraged by the efficacy results to date." The press release highlighted the "rapid and sustained benefit observed in patients after a single dose of [etokimab]," which the Individual Defendants also touted as an "encouraging" result.

49. The Individual Defendants also convened a conference call with analysts on October 10, 2017, in order to discuss the interim analysis of data from the Phase 2a AD Trial. During the call, defendant Suria described the "positive" data as "provid[ing] a solid foundation for the continued development of [etokimab] across a number of atopic diseases [like peanut allergy and asthma]." Suria explained that, because the underlying physiological cause is similar across all the atopic diseases that etokimab is intended to treat, the Individual Defendants were "encouraged by what we're seeing so far in the results disclosed today and what that means in terms of potential translation to the peanut allergy trial." Defendant Suria also expressed the belief that the Company could build on the results with

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

multidosing in a Phase IIb study and that they could achieve even greater EASI scores.

50.     Defendant Londei, the Company's CMO, added that "[b]ased upon this data, we believe that a single dose of [etokimab] can maintain efficacy benefit in adult moderate-to-severe atopic dermatitis patients for approximately 2 months, which meaningfully differentiate[s] [etokimab] in terms of patient convenience."

51.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████

52.     Shortly after reporting these encouraging results, on or around October 12, 2017, the Individual Defendants caused AnaptysBio to conduct a secondary offering (the "**2017 SPO**") pursuant to a registration statement filed with the SEC (the "**2017 SPO Registration Statement**"). On October 13, 2017, the Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants caused the Company to file a prospectus for the 2017 SPO with the SEC on Form 424B4 (together with the 2017 SPO Registration Statement, the "**2017 SPO Offering Materials**"). The Company raised approximately $205.5 million in the 2017 SPO on the sale of 3 million shares of common stock.

53.     In the 2017 SPO Offering Materials, the Individual Defendants described the data from the Phase2a AD Trial as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience." The Individual Defendants also indicated that the interim Phase 2a AD Trial results served as the basis for the Company's plan to initiate further development in a Phase 2b multi-dose trial (the "**ATLAS Trial**") for treating atopic dermatitis. The 2017 SPO Registration Statement was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper, and Ware.

54.     On November 7, 2017, the Individual Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q for the third quarter of 2017 (the "**3Q 2017 10-Q**"). Mirroring the statements made in the 2017 IPO Offering Materials, the 3Q 2017 10-Q characterized the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for [etokimab]" in the atopic dermatitis indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  patient convenience," and serving as the basis for imminent initiation of the ATLAS

2  Trial.

3

4       55.   ███████████████████████████████████████████

5  ███████████████████████████████████████████████████

6  ███████████████████████████████████████████████████

7

8  ███████████████████████████████████████████████████

9  ███████████████████████████████████████████████████

10 ███████████████████████████████████████

11

12      56.   On February 17, 2018, the Individual Defendants caused AnaptysBio

13 to issue a press release announcing updated data from the Phase 2a AD Trial, which

14 was presented at the American Academy of Dermatology Annual Meeting in San

15 Diego. The press release stated that "[etokimab] was efficacious in all 12 patients

16 enrolled in this trial" and "[e]fficacy was sustained through day 140 following single

17 dose administration of [etokimab] with five of 12 patients (42 percent) achieving

18 EASI-50" and the drug's efficacy "was not limited by disease severity." The press

19 release also reported that "[d]ay 29 results exceeded the primary efficacy objective

20 of the trial with 10 of 12 patients (83 percent) achieving EASI-50" and that "[o]ther

21 atopic dermatitis efficacy endpoints…demonstrated rapid and sustained single dose

22 [etokimab] efficacy results in a similar manner to the…EASI results."

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

57.     On March 5, 2018, the Individual Defendants caused AnaptysBio to file its Annual Report with the SEC on Form 10-K for the fourth quarter and full year 2017 (the "**2017 10-K**"). The 2017 10-K described the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. The 10-K also stated that the drug's "efficacy was not limited by disease severity." The 2017 10-K was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper, and Ware.

58.     While the Individual Defendants continued to tout the positive results of the Phase 2a AD Trial for atopic dermatitis, they also began issuing misleading statements about another etokimab trial for the treatment of peanut allergy.

## C.     The Individual Defendants Begin Touting the Efficacy of Etokimab as a Treatment for Peanut Allergy

59.     On March 26, 2018, after the markets closed, the Individual Defendants caused the Company to issue a press release, which was also filed as a Current Report on Form 8-K with the SEC, announcing data from an interim analysis of a Phase 2a trial for etokimab in adult patients with peanut allergy (the "**Phase 2a Peanut Trial**"). The baseline peanut tolerance of each patient was evaluated at enrollment using a blinded, placebo-controlled oral food challenge ("**OFC**"). Both

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the initial OFC and the OFC administered at 14 days after dosing were limited to a maximum 500mg cumulative dose of peanut protein. The efficacy of etokimab in treating the peanut allergy was tested by measuring the cumulative dose of peanut protein tolerated by patients 14 days after receiving a single dose of either etokimab or placebo, relative to the peanut tolerance established by the baseline OFC.

60.     The Phase 2a Peanut Trial had enrolled 20 adult peanut allergy patients with a clinical history of anaphylaxis after peanut exposure. Only 16 patients, however, were included in the interim analysis. According to the March 26, 2018 press release, two etokimab-dosed and two placebo-dosed patients were excluded from the analysis because they had exhibited "mild" baseline symptoms. While the press release indicated that one etokimab-dosed excluded patient and two placebo-dosed etokimab excluded patients were able to tolerate the 500mg maximum cumulative peanut dose at the day 14 OFC, the Individual Defendants disclosed no further details regarding the excluded patients.

61.     Reporting on the available data, the Individual Defendants noted that six out of 13 patients (46%) improved their peanut tolerance to a cumulative 500mg dose of peanut protein at day 14 after a single dose of etokimab, while none of the three patients dosed with placebo experienced this improvement.

62.     Although the Company had excluded ***20% of the patients*** enrolled in the trial from the interim data analysis, thereby creating a very limited sample size,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

in the March 26, 2018 press release the Individual Defendants touted etokimab as a "promising new paradigm for peanut allergy patients." Thus, based on the "positive" data from the study, the Individual Defendants announced the Company's plans to continue development of etokimab in the ATLAS Trial.

63.     On March 26, 2018, during a conference call with analysts to discuss the data from the Company's Phase 2a Peanut Trial, defendant Suria stated that "[w]e have demonstrated proof of concept in adult peanut allergy patients with moderate-to-severe baseline symptoms or a single dose of [etokimab] resulting in 46% of patients achieving the maximum-tested peanut tolerance in 14 days."

64.     When an analyst questioned how the reported results would have been affected by inclusion of the patients with mild symptoms, Suria deflected, stating: "[w]e're not really providing a whole lot of context here on the [patients exhibiting] mild [baseline symptoms] because that's not our focus." Suria also represented that "there was clear separation" in the peanut tolerability amongst those patients dosed with etokimab versus those patients dosed with a placebo and that "we're seeing a clear benefit of the drug here and a clear signal for us to move forward in the moderate-to-severe baseline adult peanut allergy population."

65.     In response to another analyst question about whether the exclusion of patients with mild symptoms was done in a prespecified manner, Suria again avoided a direct answer, stating that "the intent of the study all along from the very beginning

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   was to focus on the more severe patients." Suria also represented that "not only did

2   we get the signal that we wanted to in order to move forward, but we also learned

3   how to focus in on the population and not just rely on anaphylaxis, but to take a look

4   at their baseline severity as how you would segregate them."

5

6   66.   Although the Company had excluded 20% of the patients enrolled in

7   the trial from the interim data analysis, the Individual Defendants touted the drug as

8   a "promising new paradigm for peanut allergy patients" and indicated that, based on

9   the "positive" data from the Phase 2a Peanut Trial, AnaptysBio planned to initiate

10  the ATLAS Trial.

11

12  67.   The statements referenced in ¶¶ 46-66, *supra*, were materially false and

13  misleading and failed to disclose material adverse facts about the prospects of

14  etokimab. In particular, the Individual Defendants failed to disclose whether the

15  Company had retrospectively excluded 20% of the patients enrolled in the peanut

16  allergy study from the interim analysis due to their mild symptoms, rather than

17  properly excluding those patients in a prespecified manner. As a result, the

18  Individual Defendants' positive statements about the efficacy and prospects of

19  etokimab in the treatment of peanut allergy were materially false and/or misleading

20  and/or lacked a reasonable basis. Similarly, the Individual Defendants failed to

21  disclose that certain patients' use of topical corticosteroids as a rescue therapy during

22  the atopic dermatitis study were classified as "responders" per the study's endpoints.

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also materially false and/or misleading and/or lacked a reasonable basis.

### D.      The Individual Defendants' Statements About Etokimab Come Into Question

68.     On March 26, 2018, the same day that the Individual Defendants publicized the interim analysis of the Phase 2a Peanut Trial data, an analyst from RBC issued the March RBC Report which questioned the veracity of that data. The March RBC Report stated that "[etokimab's] response rate in an [intent-to-treat] population does not appear to be meaningfully differentiated" relative to the placebo.

69.     The March RBC Report further explained that since AnaptysBio excluded two patients from each arm of the trial due to having mild symptoms, the difference between the etokimab-treated arm and the placebo arm was only *approximately 7%*—significantly less than the 46% response rate that the Company reported from its subgroup analysis. Specifically, when including the patients that the Company had excluded from its trial data analysis, seven of 15 patients (or 47%) improved their peanut tolerance to a cumulative 500mg at the day-14 OFC, compared to two of five patients (or 40%) dosed with placebo.

70.     The March RBC Report also noted that "[t]hese data remain challenging to interpret" because the Company did not disclose the average tolerated peanut dose at 14 days or the average improvement in peanut tolerance from the

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

patients' baseline. The March RBC Report highlighted that the "[l]ack of disclosure of improvement delta between baseline and day 14 in both trial arms obfuscates the actual improvement data and complicates contextualization of clinical meaningfulness" and makes it "difficult to contextualize the breadth of allergic protection provided by [etokimab]." The March RBC Report also questioned the Company's use of a mild versus moderate-to-severe patient stratification and its decision to exclude those patients exhibiting mild symptoms, pointing out that these exclusions were neither detailed in the clinicaltrials.gov listing nor in management's prior trial descriptions.

71. ███████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

72.   After the March RBC Report was published, the price of AnaptysBio common stock declined nearly 6%, from a closing price of $113.83 per share on March 26, 2018, to a closing price of $107.52 on March 27, 2018.

73.   A few days later, on April 4, 2018, the same analyst from RBC issued the April RBC Report, downgrading the Company's stock and reducing the price target from $144 to $86 "on increased skepticism regarding [etokimab's] path forward in peanut allergy" as well as "concern surrounding management credibility." The April RBC Report also called into question the Company's decision to omit the mild-symptom patients as "likely retrospective and not prespecified" and thus "statistically questionable." Significantly, RBC nearly fully removed etokimab in the treatment of peanut allergy from its valuation model—decreasing its probability of success estimates for etokimab in severe adult peanut allergy from 35% to only 5%.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### E.    The Individual Defendants Double Down on Their Misrepresentations

74.    Notwithstanding the RBC Reports,[3] the Individual Defendants continued to tout etokimab's efficacy in the treatment of patients with peanut allergy, creating the public impression that it was moving into the next trial. Indeed, months after the RBC Reports were published, the Individual Defendants continued to insist in the Company's public filings that AnaptysBio had "demonstrated proof-of-concept for [etokimab] in Phase 2a trials in atopic dermatitis and peanut allergy."

75.    On May 8, 2018, for example, the Individual Defendants highlighted positive trial results in two separate SEC filings by the Company. In a press release posted on the Company's website, which was also filed on Form 8-K with the SEC, the Individual Defendants announced the Company's financial results for the first quarter of 2018, again insisting that the Company had "demonstrated proof-of-concept for [etokimab] in Phase 2a trials in atopic dermatitis and peanut allergy." Defendant Suria also shared that the Company purportedly looked "forward to further evaluating the efficacy and safety of [etokimab] in Phase 2b studies for these indications."

76.    That same day, the Individual Defendants caused the Company to also file its quarterly report with the SEC on Form 10-Q for the first quarter of 2018 (the

_____

[3] The March RBC Report and the April RBC Report are collectively referred to herein as the "**RBC Reports**."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"**1Q 2018 10-Q**"). As with the Company's other recent public filings, in the 1Q 2018 10-Q the Individual Defendants described the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's plan to initiate further development in atopic dermatitis through the initiation of a Phase 2b multi-dose trial. Regarding the Company's interim analysis of data from its Phase 2a Peanut Trial, the 1Q 2018 10-Q stated that "six of thirteen (46%) patients administered a single dose of [etokimab] improved peanut tolerance at the day 14 [oral food challenge] to the maximum tested cumulative 500mg dose, compared to none of the placebo dosed patients."

77.     Further, when presenting at the 2018 Bank of America Merrill Lynch Healthcare Conference on May 16, 2018, defendant Suria, on behalf of the Company, referred to the "pretty profound efficacy" of etokimab in its treatment of atopic dermatitis. When speaking about the Phase 2a Peanut Trial, defendant Suria told conference attendees that the Company was "quite excited by this data" and "look[ed] forward to moving into" further development in peanut allergy treatment.

78.     On May 29, 2018, the Individual Defendants caused the Company to issue a press release announcing that earlier that day the Company had presented updated data from the Phase 2a AD Trial at the 2018 European Academy of Allergy

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and Clinical Immunology Congress in Munich, Germany. The press release stated that "[etokimab] was efficacious in all 12 patients enrolled in this trial" and "[e]fficacy was sustained through day 140 following single dose administration of [etokimab] with five of 12 patients (42%) achieving EASI-50" and the drug's efficacy "was not limited by disease severity." The press release also reported that "[d]ay 29 results exceeded the primary efficacy objective of the trial with 10 of 12 patients (83%) achieving EASI-50" and that "[o]ther atopic dermatitis efficacy…demonstrated rapid and sustained single dose [etokimab] efficacy results in a similar manner to the…EASI results."

79.    In the same press release, the Individual Defendants announced that the Company had also initiated the ATLAS Trial, a Phase 2b multi-dose study to evaluate the efficacy of etokimab in approximately 300 adult patients with moderate-to-severe atopic dermatitis. Data was expected in 2019.

80.    The statements referenced in ¶¶ 74-79, *supra*, were materially false and misleading and failed to disclose material adverse facts about the prospects of etokimab. In particular, the Individual Defendants failed to disclose whether the Company's decision to exclude 20% of the patients enrolled in the study from the interim analysis due to their mild symptoms was retrospective or had been prespecified. The Individual Defendants also failed to disclose the patients' average cumulative peanut dose tolerated at day 14 after the administration of etokimab or

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

placebo. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of peanut allergy were materially false and/or misleading and/or lacked a reasonable basis. Similarly, the Individual Defendants failed to disclose that certain patients' use of topical corticosteroids as a rescue therapy during the atopic dermatitis study were classified as "responders" per the study's endpoints. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also materially false and/or misleading and/or lacked a reasonable basis.

### F. The Individual Defendants Deprioritize Clinical Development of Peanut Allergy Trials

81. On August 7, 2018, less than three months after the Individual Defendants touted etokimab's efficacy in the treatment of peanut allergy as "remarkable" and led the public to believe it was moving into the next stage of the trial, the Individual Defendants announced that AnaptysBio had abandoned its pursuit of etokimab as a treatment for peanut allergy ***"[a]s a result of market assessment"*** and that the Company did not intend to use its resources to pursue a Phase 2b clinical trial.[4] (Emphasis added).

82. ████████████████████████████████████

██████████████████████████████████████

---

[4] https://ir.anaptysbio.com/news-releases/news-release-details/anaptysbio-announces-second-quarter-2018-financial-results-and.

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



85.     Despite the abandonment of the peanut allergy trials, the Individual Defendants continued to promote the positive results of the Phase 2a AD Trial for another *ten months*, until the issuance of the Credit Suisse Report questioning the data.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

86.    On the same day that the Individual Defendants announced that AnaptysBio would be deprioritizing further clinical development of etokimab for the treatment of peanut allergy, the Individual Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q for the second quarter of 2018 (the "**2Q 2018 10-Q**"). The Company's 2Q 2018 10-Q described the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial. The 10-Q also stated that "etokimab results were not limited by disease severity" and "[o]ther efficacy endpoints…demonstrated rapid and sustained single dose etokimab results in a similar manner to the…EASI results."

87.    On September 25, 2018, the Individual Defendants caused AnaptysBio to conduct another secondary offering (the "**2018 SPO**"), pursuant to a shelf registration statement that the Individual Defendants caused the Company to file with the SEC on Form S-3 on February 5, 2018 (the "**2018 SPO Registration Statement**"). The following day, the Individual Defendants caused AnaptysBio to file a prospectus supplement with the SEC on Form 424B5 in connection with the 2018 SPO Registration Statement (together with the 2018 SPO Registration Statement, the "**2018 SPO Offering Materials**"). In the 2018 SPO, approximately

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$207 million was raised on the sale of 2.2 million shares of AnaptysBio common stock.

88.     The 2018 SPO Offering Materials contained the same false and misleading statements that the Individual Defendants had previously made in the 2017 SPO Offering Materials. The Individual Defendants described the data from the Phase 2a trial for atopic dermatitis as demonstrating "proof-of-concept for [etokimab]" in this indication, "suggest[ing] that [etokimab] may provide meaningful differentiation in terms of patient convenience," and furthering the Company's plan to initiate the ATLAS Trial. The 2018 SPO Registration Statement was signed by defendants Suria, Gallagher, Lydon, Renton, Schmid, Schoeneck, Topper, and Ware.

89.     On November 8, 2018, the Individual Defendants caused the Company to file its quarterly report with the SEC on Form 10-Q for the third quarter of 2018 (the "**3Q 2018 10-Q**"). The 3Q 2018 10-Q described the data from the Phase 2a AD Trial as demonstrating "proof-of-concept for etokimab" in this indication, "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience," and serving as the basis for the Company's further development in atopic dermatitis through the enrollment of patients in a Phase 2b multi-dose trial.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

90.     On January 8, 2019, defendant Suria presented on behalf of AnaptysBio at the JPMorgan Global Healthcare Conference. During the conference, in describing the results from the Phase 2a AD Trial, defendant Suria stated that the Company had exceeded its goal of 50% responders "quite robustly" and touted the results as "a very exciting data event." Defendant Suria also stated that the "time line and robustness of that single dose efficacy…gave us a sense that we could robustly advance this program into a multidose Phase IIb."

91.     The Individual Defendants caused the Company to file its annual report for 2018 with the SEC on February 28, 2019 (the "**2018 10-K**"). Therein, the Individual Defendants once again highlighted the updated positive results of the Phase 2a AD Trial. Specifically, the 2018 10-K falsely described the trial data as demonstrating "proof-of-concept for etokimab" in this indication and "suggest[ing] that etokimab may provide meaningful differentiation in terms of patient convenience." Moreover, the Individual Defendants again asserted that "etokimab efficacy was not limited by disease severity."

92.     A few months later, on May 14, 2019, AnaptysBio presented at the 2019 Bank of America Merrill Lynch Healthcare Conference. During the conference, defendant Suria touted etokimab as "a widespread, rapid and durable response in atopic dermatitis" based on the trial's "efficacy data." The Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants further highlighted that the trial saw a "really remarkable result where a single dose of our drug…had widespread efficacy across all these individuals."

93.     These public disclosures continued to affirm the drug's efficacy in the treatment of atopic dermatitis in the initial trial and encouraged expectations of positive results in the ATLAS Trial. The Individual Defendants' repeated false assertions as to the efficacy and prospects of AnaptysBio's lead drug had the effect of inflating the Company's stock during the Relevant Period.

94.     The statements referenced in ¶¶ 81-93, *supra*, were materially false and misleading and failed to disclose material adverse facts about the prospects of etokimab. In particular, the Individual Defendants failed to disclose the timing and extent of certain patients' use of a rescue therapy during the study, as well as whether any of those participants were classified as "responders" per the study's endpoints. As a result, the Individual Defendants' positive statements about the efficacy and prospects of etokimab in the treatment of atopic dermatitis were also materially false and/or misleading and/or lacked a reasonable basis.

**G.     Credit Suisse Questions the Veracity of the Company's Atopic Dermatitis Data**

95.     On June 21, 2019, a Credit Suisse securities analyst issued the Credit Suisse Report, which questioned the veracity of the data from the Company's Phase 2a AD Trial due to patients' use of topical corticosteroids as a rescue therapy during the study. The Credit Suisse Report also criticized AnaptysBio's failure to provide

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

details on the timing of rescue therapy use or whether the subjects that used it were classified as participants during the trial.

96.     The Credit Suisse Report explained that because of the trial's small sample size, even a single subject who used a rescue therapy during the study and was classified as a responder "could substantially skew the response rates" and "chang[e] the interpretation of the data as it relates to the overall prospects of the asset." Accordingly, due to the study's small sample size and lack of critical details provided by the Company, the Credit Suisse Report concluded that "we must consider the possibility that the presence of rescue medications could have influenced the trial's response rates" and "we are now less certain about etokimab's efficacy profile, particularly in atopic dermatitis."

97.     The Credit Suisse Report also expressed "concerns about the interpretability of prior [Phase 2a] atopic dermatitis data," which prompted Credit Suisse "to adopt a lower probability of success assumption ahead of [Phase 2b trial] data." As a result, Credit Suisse downgraded the Company's stock to neutral from outperform and cut its price target by *nearly 60%* – from $137 per share to $79 per share.

98.     On this news, the price of AnaptysBio common stock declined nearly 12%, from a closing price of $67.02 per share on June 20, 2019, to a closing price of $59.24 per share on June 21, 2019.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

99.   The Credit Suisse Report's allegations regarding the lack of veracity of the Phase 2a AD Trial data were confirmed when, less than two months later, the Individual Defendants announced "very disappoint[ing]" data from the ATLAS Trial. Specifically, the Individual Defendants revealed that the results "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the EASI relative placement at week 16." This was contrary to the continued anticipation of positive results from the ATLAS Trial beginning on October 10, 2017 when the Individual Defendants stated that they "anticipate[d] that we can get to even greater EASI scores."

## H.    The Truth is Revealed

100.   After years spent touting the efficacy of etokimab, on November 8, 2019, the Individual Defendants announced "very disappoint[ing]" data from the Company's ATLAS Trial. Specifically, the Individual Defendants disclosed that each of the etokimab dosing arms "failed to meet the primary endpoint of the trial, which was demonstration of statistically greater improvement in the Eczema Area and Severity Index (EASI) relative placebo at week 16." As a result, the Individual Defendants disclosed that the Company would postpone the initiation of its clinical trial for etokimab in asthma.

101.   This disclosure caused several securities analysts to immediately downgrade AnaptysBio's stock. For example, Wedbush Securities downgraded the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's stock to neutral from outperform and slashed its price target from $96 per share to only $20 per share. The report discussing the Company's shocking announcement stated that "we're disappointed and surprised by the readout" and "are now entirely removing etokimab from our valuation."

102.    Analysts at Guggenheim Securities, LLC also downgraded the Company's stock (to neutral from buy), removed its price target entirely "following negative Phase IIb results from their key drug etokimab…in atopic dermatitis," and concluded that etokimab is "likely to be discontinued."

103.    Analysts at Cantor Fitzgerald, like the market at large, "were surprised by the results" and highlighted that "the largest risk to the shares is the growing number of investor questions we are getting around credibility and execution." As a result, Cantor Fitzgerald removed credit to etokimab in its valuation model of the Company and slashed its price target for AnaptysBio's common stock from $140 to $28 per share.

104.    Even analysts at RBC, which had issued the RBC Reports in 2018, stated that "[w]hile we had reservations about prior data from etokimab programs…as well as [management] credibility…we're surprised by this outright failure as well as the lack of an investor call to discuss the most significant development in the history of the company."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

105.   Stifel Nicolaus analysts noted that the "all out failure of etokimab" in the Company's ATLAS Trial "calls into question its ability to demonstrate efficacy in other atopic diseases and is no doubt the worst case scenario" for the Company.

106.   On this news, the price of AnaptysBio common stock declined nearly **_72%_**, from a closing price of $36.16 per share on November 7, 2019 to a closing price of $10.18 on November 8, 2019.

## I.   Top Company Insiders Reaped Nearly $21.7 Million from Stock Sales Based on Their Possession of Material, Adverse, Non-Public Information

107.   Before the truth emerged and the Company's stock price collapsed, certain of the Individual Defendants, including the senior-most leaders of the Company, engaged in a series of suspicious stock transactions, collectively reaping approximately **_$21.7 million_** based on their knowledge of material, adverse, non-public information.

108.   First, defendant Lydon sold 33,000 shares of AnaptysBio common stock in April 2018 – almost 11% of his holdings – for proceeds of nearly **_$2.9 million_**.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

109.   Next, over a span of only approximately six months between December 3, 2018 and June 10, 2019 – while AnaptysBio's stock price remained artificially inflated because of the Individual Defendants' materially false and misleading statements concerning the Company's Phase 2a AD Trial – defendants Suria, Londei, and Piscitelli collectively sold over 265,000 shares of their personally held, artificially inflated AnaptysBio stock.

110.   These stock sales, nearly all of which were made when the Company's stock was trading for roughly double its closing price on October 9, 2017 (the day before the beginning of the Relevant Period) netted defendant Suria *over $12 million*, defendant Londei *over $4 million* , and defendant Piscitelli *over $2.6 million*.

111.   A mere two weeks after the August 7, 2018 disclosure that the Company's long-awaited peanut allergy study had been abandoned and that AnaptysBio would not pursue a Phase 2b clinical trial for the peanut allergy indication – which caused the stock to drop significantly – defendants Londei, Piscitelli, and Suria decided to devise, for the first time, 10b5-1 trading plans that would allow them to sell millions of dollars' worth of AnaptysBio common stock

40

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

before more disappointing news could emerge publicly concerning etokimab's lack of efficacy and the Phase 2a AD Trial's design flaws.

112.   Indeed, these defendants' insider selling was affected largely pursuant to 10b5-1 trading plans entered into between August 16, 2018 and August 22, 2018, less than two weeks after the Phase 2a Peanut Trial was abruptly terminated, but while the Individual Defendants were still touting the projected success of the atopic dermatitis and asthma studies. Defendant Londei also entered into an additional 10b5-1 trading plan on March 13, 2019.

113.   These trading plans enabled defendants Suria, Londei, and Piscitelli to rapidly offload millions of dollars' worth of shares at a massive profit when no one else at the Company could trade, and just before the June 21, 2019 Credit Suisse Report and the Company's November 2019 disclosures, which both revealed the truth about the weaknesses of the atopic dermatitis trial design and trial plans and caused AnaptysBio's stock price to plummet.

114.   During the Relevant Period, defendants Suria, Londei, Piscitelli, and Lydon did not purchase a single share of AnaptysBio stock on the open market.

115.   Defendant Suria personally sold 169,741 shares of AnaptysBio common stock between December 2018 and June 2019 – over **91%** of his holdings available for sale – and collected approximately $12,067,670 million in proceeds for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a net profit of $11,858,527. Defendant Suria's sales during the Relevant Period are reflected below:

| Transaction Date | Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/10/2018 | 15,276 | $70.57 | $1,078,082 |
| 12/10/2018 | 10,347 | $71.49 | $739,701 |
| 12/10/2018 | 4,964 | $72.48 | $359,805 |
| 12/11/2018 | 4,998 | $70.83 | $354,008 |
| 12/12/2018 | 12,003 | $71.11 | $853,481 |
| 12/12/2018 | 9,673 | $71.92 | $695,718 |
| 12/12/2018 | 8,324 | $72.88 | $606,618 |
| 12/14/2018 | 24,844 | $68.89 | $1,711,429 |
| 12/14/2018 | 9,084 | $69.68 | $632,968 |
| 12/14/2018 | 7,800 | $70.51 | $549,979 |
| 1/14/2019 | 27,760 | $70.65 | $1,961,227 |
| 1/14/2019 | 12,240 | $71.10 | $870,304 |
| 6/10/2019 | 8,540 | $72.64 | $620,385 |
| 6/10/2019 | 6,440 | $73.70 | $474,637 |
| 6/10/2019 | 5,000 | $74.68 | $373,413 |
| 6/10/2019 | 1,994 | $75.86 | $151,271 |
| 6/10/2019 | 454 | $76.31 | $34,654 |
| **TOTALS** | **169,741** | | **$12,067,670** |

42

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

116.   Defendant Londei sold 59,183 shares of AnaptysBio common stock between December 2018 and June 2019 – over **73%** of his holdings available for sale – and collected approximately $4,073,699 million in proceeds for a net profit of $3,776,373. Defendant Londei's sales during the Relevant Period are reflected below:

| Transaction Date | Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/17/2018 | 12,120 | $65.36 | $792,178 |
| 12/17/2018 | 8,002 | $67.57 | $540,684 |
| 12/17/2018 | 6,741 | $68.47 | $461,578 |
| 12/17/2018 | 3,185 | $66.38 | $211,416 |
| 1/15/2019 | 14,894 | $70.04 | $1,043,195 |
| 1/15/2019 | 4,181 | $69.29 | $289,686 |
| 6/4/2019 | 6,009 | $72.45 | $435,359 |
| 6/4/2019 | 2,048 | $73.43 | $150,384 |
| 6/4/2019 | 2,003 | $74.50 | $149,219 |
| **TOTALS** | **59,183** | | **$4,073,699** |

117.   Defendant Piscitelli sold 37,000 shares of AnaptysBio common stock in December 2018 – **all** of his holdings available for sale – and collected approximately $2,669,158 million in proceeds for a net profit of $2,249,578. Defendant Piscitelli's sales during the Relevant Period are reflected below:

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Transaction Date | Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 12/3/2018 | 18,604 | $71.33 | $1,327,061 |
| 12/3/2018 | 6,624 | $74.33 | $492,362 |
| 12/3/2018 | 4,820 | $72.24 | $348,212 |
| 12/3/2018 | 3,554 | $70.34 | $249,974 |
| 12/3/2018 | 2,298 | $73.18 | $168,159 |
| 12/3/2018 | 1,100 | $75.18 | $83,390 |
| **TOTALS** | **37,000** | | **$2,669,158** |

118.   Defendant Lydon sold 33,000 shares of AnaptysBio common stock in April 2018 – almost 11% of his position – and collected approximately $2,866,793. His sales during the Relevant Period are reflected below:

| Transaction Date | Shares Sold | Price Per Share | Gross Proceeds |
|---|---|---|---|
| 4/16/2018 | 2,600 | $84.18 | $218,868 |
| 4/16/2018 | 10,310 | $85.11 | $877,484 |
| 4/16/2018 | 1,390 | $86.15 | $119,748 |
| 4/16/2018 | 9,425 | $87.46 | $824,310 |
| 4/16/2018 | 4,250 | $88.29 | $375,232 |
| 4/16/2018 | 2,803 | $89.41 | $250,616 |
| 4/16/2018 | 2,222 | $90.25 | $200,535 |
| **TOTALS** | **33,000** | | **$2,866,793** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

119.   Notably, each of defendants Suria, Londei, and Piscitelli reaped vastly more in proceeds from their sales of AnaptysBio stock during the Relevant Period than they earned in salary. In 2019, defendant Suria earned $567,000 in salary, yet reaped $4,485,882 from his insider stock sales. In 2018, defendant Suria earned $547,000 in salary, yet reaped **12.8 times** that amount – $7,581,788 – from insider stock sales in the 2018 fiscal year.

120.   Defendant Londei received $436,000 and $453,000 in salary in 2018 and 2019, respectively. From his insider stock sales, however, he collected $2,005,856 in 2018 and $2,067,843 in 2019 – in both years more than three and a half times his salary.

121.   Defendant Piscitelli earned a salary of $397,000 in 2018, yet reaped more than $2,669,158 from his insider stock sales – 572.33% (over 5.7 times) of his salary.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

122.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage AnaptysBio in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of AnaptysBio and its stockholders to

benefit all stockholders equally and not in furtherance of their personal interest or benefit.

123.   Each Individual Defendant owes and continues to owe AnaptysBio and its stockholders the non-exculpable fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

124.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of AnaptysBio, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with AnaptysBio, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

125.   To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.  ensure that the Company complied with its legal obligations and requirements – including requirements involving the filing of accurate financial and operational information with the SEC – and refrain from engaging in insider trading and other deceptive conduct;

b.  conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

c.  remain informed as to how AnaptysBio conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d.  truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

126.   The Individual Defendants, as officers and/or directors of AnaptysBio, were bound at all times by the Company's Code of Business Conduct[5] (the "**Code of Conduct**"), which required the following:

> **This Code shall apply to all the Company's employees and directors.** The Company may modify or update these more specific policies and procedures from time to time and adopt new Company policies and procedures in the future.
>
> ***
>
> The Company's success depends upon each employee and director performing his or her Company duties in compliance with applicable laws and in cooperation with governmental authorities. It is essential that employees and directors know and understand the legal and regulatory requirements that apply to the Company's business and to their specific area of responsibility. While employees and directors are not expected to have complete mastery of these laws, rules and regulations, they are expected to be able to recognize situations thatrequire them to consult with others to determine the appropriate course of action. To address questions in the area of legal compliance, employees should approach their supervisor or the Compliance Officer immediately.
>
> ***
>
> **V.   INSIDER TRADING**
>
> **Every employee and director is prohibited from using "inside" or material nonpublic information about the Company**, or about companies with which it does business, in connection with buying or selling the Company's or such other companies' securities, including "tipping" others who might make an investment decision on the basis

---

[5] *See* AnaptysBio Code of Business Conduct,
https://ir.anaptysbio.com/static-files/44ea0a0a-be60-4f0d-8860-dcf838112794.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of this information. **It is illegal, and it is a violation of this Code and other Company policies, to tip or to trade on inside information.** Employees or **directors who have access to inside information are not permitted to use or share that inside information for stock trading purposes** or for any other purpose except to conduct Company business.

\*\*\*

## VII.   MAINTENANCE OF CORPORATE BOOKS, RECORDS AND ACCOUNTS; FINANCIAL INTEGRITY; PUBLIC REPORTING

**The Company strives to maintain complete integrity of its records and public disclosure.** The Company's corporate and business records, including all supporting entries to its books of account, must be completed honestly, accurately and intelligibly. The Company's records are important to investors and creditors. The Company depends on its books, records and accounts accurately and fairly reflecting, in reasonable detail, its assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

\*\*\*

**The Company's disclosure controls and procedures are designed to help ensure that the Company's public disclosures are full, fair and accurate**, that they fairly present its financial condition and results of operations, and that they are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way to preparing or verifying these reports should adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks.

\*\*\*

**If any employee becomes aware that the Company's public disclosures are not full, fair and accurate, or if any employee becomes aware of a transaction or development that he or she**

49

**believes may require disclosure, he or she should report the matter immediately to the Compliance Officer.**

\*\*\*

## XIII.  CONDUCT OF SENIOR FINANCIAL PERSONNEL

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Chief Executive Officer and senior finance department personnel must adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Controller (if any) and any other persons performing similar functions ("Senior Financial Employees"):

\*\*\*

- Act with honesty and integrity and use due care and diligence in performing his or her responsibilities to the Company.

\*\*\*

- Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

(Emphasis added).

127.    Defendants Suria, Lydon, Londei, and Piscitelli failed to adhere to the Code of Conduct by executing insider sales of Company stock based on their possession of material, adverse, non-public information. Furthermore, the Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants failed to adhere to the Code of Conduct by repeatedly causing the Company to file disclosures during the Relevant Period that were not "full, fair and accurate" regarding the use of etokimab in the treatment of peanut allergy and atopic dermatitis.

## **NON-EXCULPABLE BREACHES OF DUTIES**

128.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of AnaptysBio, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

129.   The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with etokimab. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused AnaptysBio substantial damage.

130.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of AnaptysBio, were able to and did, directly

or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, AnaptysBio has expended, and will continue to expend, significant sums of money.

## **DAMAGES TO ANAPTYSBIO**

131.   Further, as a direct and proximate result of the Individual Defendants' misconduct, the Company has been exposed to a myriad of financial damages, including but not limited to:

a.   The costs incurred from compensation and benefits paid to the Individual Defendants, who breached their fiduciary duties;

b.   Nearly $22 million in money paid out to Defendants Londei, Lydon, Piscitelli, and Suria as a result of their insider trading during the Relevant Period;

c.   Liability arising from the Federal Securities Class Action; and

d.   Attorneys' fees and expenses associated with Federal Securities Class Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

132. Plaintiffs bring this action derivatively and for the benefit of AnaptysBio to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of AnaptysBio, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

133. AnaptysBio is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134. Plaintiffs are, and have been continuously at all relevant times, stockholders of AnaptysBio. Plaintiffs will adequately and fairly represent the interests of AnaptysBio in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

135. Plaintiffs incorporate by reference and re-allege each allegation stated above as if fully set forth herein.

136. A pre-suit demand on the Board of AnaptysBio is futile and, therefore, excused. At the time of filing of this action, the Board consists of eight directors: Individual Defendants (i) Topper, (ii) Fenton, (iii) Hamill, (iv) Renton, (v) Schmid, (vi) Suria, and (vii) Ware (the "**Director Defendants**"), along with one non-party

53

director (Ms. Marquet). Plaintiffs need only allege demand futility as to a majority of the directors (at least four out of eight) on the Board at the time this action is commenced.

137.  Demand is excused as to all seven Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

138.  In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The illicit scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

139.  Demand on Defendants Suria, Renton, Schmid, Topper, and Ware is futile because they personally made false and misleading statements in violation of their fiduciary duties of loyalty and good faith and face a substantial likelihood of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

liability as a result. 

Regardless, defendants Suria, Renton, Schmid, Topper, and Ware signed and thus personally made the false and misleading statements in the 2017 SPO Registration Statement, filed October 13, 2017,

Thus, demand upon Suria, Renton, Schmid, Topper, and Ware would be futile.

140.

Regardless, defendants Suria, Renton, Schmid, Topper, and Ware signed and thus personally made the false and misleading statements in the 2018 SPO Registration Statement, filed February 5, 2018, and 2017 10-K, filed March 5, 2018,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

████████████████████████████████████████████████ Thus, demand

upon Suria, Renton, Schmid, Topper, and Ware is futile.

141. Regardless of the Board's knowledge listed above, defendants Suria, Fenton, Renton, Schmid, Topper, and Ware signed and thus personally made the false and misleading statements regarding etokimab's treatment of atopic dermatitis in the 2018 10-K, filed February 28, 2019, and the truth was not revealed until November 8, 2019. Thus, demand upon Suria, Fenton, Renton, Schmid, Topper, and Ware is futile.

142. Accordingly, pre-suit demand is excused as futile. In addition:

i. Demand on defendant **Topper** is futile because defendant Topper is a co-founder of the Company. Second, defendant Topper has been a partner with Frazier Healthcare since August 2003, serving as General Partner since 2005. According to the Proxy Statement filed April 27, 2020 with the SEC (the "**2019 Proxy**"), Frazier Healthcare Entities owned 8.7% of the Company's stock. Third, defendant Topper is the Company's independent chairman while also serving as Chief Executive Officer and Chairman of the Board of Frazier Lifescience Acquisition Corp. He is also a managing director of Frazier Life Sciences and its affiliated funds. Fourth, defendant Topper has served or serves on the Boards of other entities in which Frazier entities held or holds stakes: (a) Rempec Pharmaceuticals; (b) Amicus Therapeutics; (c) Lassen Therapeutics; and (d)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Amunix Pharmaceuticals.[6] Accordingly, demand on defendant Topper would be futile because he owes loyalties to both the Company and to Frazier, which owns approximately 8.7% of the Company as well as interests in other entities to which defendant Topper owes fiduciary duties. Topper was also the co-founder of Portola Pharmaceuticals, Inc., ("**Portola**") which was acquired by Alexion in July 2020 through a tender offer and subsequent merger of Portola with an Alexion subsidiary. Messrs. Renton and Fenton served on the Portola board.

ii.     Demand on defendant **Fenton** is futile because defendant Fenton is not independent of defendant Renton, with whom he has served on the board of directors of Portola for approximately six years. Defendant Renton was the chairman of the board of directors of Portola during this time. Because of this interconnected business relationship between defendants Fenton and Renton, there is a reason to doubt that defendant Fenton would independently and disinterestedly consider a demand against defendant Renton. Defendant Fenton is also a director of Cirius Therapuetics, another company in the Frazier portfolio family along with defendant Topper, and served as a director of Xenoprot, a Frazier portfolio company.

iii.     Demand on defendant **Renton** is futile because defendant Renton is not independent of defendant Fenton, with whom he has served on the board of directors of Portola for approximately six years. Because of this

---

[6] *See* https://www.frazierhealthcare.com/life-sciences/portfolio#?status=current.

57

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interconnected business relationship between defendants Fenton and Renton, there is a reason to doubt that defendant Renton would independently and disinterestedly consider a demand against defendant Fenton.

iv.    Demand on defendant **Suria** is futile because he personally made the false and misleading statements to the investing public during the conference calls and healthcare conferences described herein. His principal occupation is his role as CEO of the Company. Additionally, the 2019 Proxy admits that the Board itself does not consider defendant Suria to be an independent director. Defendant Suria signed and thus personally made the false and misleading statements in the 3Q 2017 10-Q, the 2017 10-K, the 1Q 2018 10-Q, 3Q 2018 10-Q, and the 2018 10-K. He also signed SOX certifications for the 3Q 2017 10-Q, 2017 10-K, 1Q 2018 10-Q, 3Q 2018 10-Q, and the 2018 10-K. Furthermore, defendant Suria made sales of stock during the Relevant Period, when the share price was inflated, for proceeds of approximately $12,044,925. As such, he has a substantial likelihood of liability in this action and is incapable of assessing whether to pursue the claims herein with disinterested independence.

143.   As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

144.   The Director Defendants have longstanding business relationships with each other and the Individual Defendants which means they cannot act independently and in the best interests of the Company. These conflicts mean these Director Defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile.

145.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

146.    AnaptysBio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for AnaptysBio any part of the damages AnaptysBio suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

147.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

148.   The acts complained of herein constitute violations of fiduciary duties owed by AnaptysBio's officers and directors, and these acts are incapable of ratification.

149.   Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

150.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

151.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

152.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

153.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

154.  The Company filed a Proxy Statement with the SEC on April 26, 2019, (the "**2018 Proxy**") which stated that the Company's directors and employees, including its CEO, CFO, and other executive and senior financial officers, are subject to the Company's Code of Conduct. The 2018 Proxy was also false and misleading because, despite assertions to the contrary, AnaptysBio's compliance with its respective codes of conduct were not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

155.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for stockholder determination in the 2018 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

156.   The false and misleading elements of the annual 2018 Proxy led to the re-elections of all of the Director Defendants, allowing them to continue breaching their fiduciary duties to AnaptysBio.

157.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy.

158.   Plaintiffs, on behalf of AnaptysBio, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

159.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

160.   The Individual Defendants, by virtue of their positions with AnaptysBio and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of AnaptysBio and officers and directors who made the false and

63

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause AnaptysBio to engage in the illegal conduct and practices complained of herein.

161.   Plaintiffs on behalf of AnaptysBio have no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants**
*for Breach of Fiduciary Duties*

162.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

163.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AnaptysBio's business and affairs.

164.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

165.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AnaptysBio.

166.   In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

167.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

168.   Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements regarding etokimab's efficacy against peanut allergies and atopic dermatitis during the Relevant Period, that assured investors that etokimab was on track to flourish as therapy, yet failed to disclose major problems which included that the Company had retrospectively excluded 20% of the patients enrolled in the Phase 2a Peanut Trial due to their mild symptoms and that certain patients who used topical corticosteroids as a rescue therapy during the Phase 2a AD Trial were nevertheless classified as "responders" per the study's endpoints.

169.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

170.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth

herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

171.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

172.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

173.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AnaptysBio has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

174. Plaintiffs on behalf of AnaptysBio have no adequate remedy at law.

## **FOURTH CLAIM**

### **Against the Individual Defendants**
*for Unjust Enrichment*

175. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

176. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of AnaptysBio.

177. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from AnaptysBio tied to the performance or artificially inflated valuation of AnaptysBio, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

178. Moreover, Defendants Suria, Londei, Piscitelli, and Lydon were unjustly enriched through insider sales of stock during the Relevant Period while the share price was inflated for total proceeds of approximately $23,831,669.

179. Plaintiffs, as stockholders and representatives of AnaptysBio, seeks restitution from the Individual Defendants and seeks an order from this Court

67

disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

180.   Plaintiffs on behalf of AnaptysBio have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants
*for Waste of Corporate Assets*

181.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

182.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and AnaptysBio will lose financing from investors and business from future customers who no longer trust the Company and its products.

183.   Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.   Plaintiffs on behalf of AnaptysBio have no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### SIXTH CLAIM

### Against Defendants Londei, Piscitelli, and Suria
*for Insider Selling (Brophy)*

185.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though full set forth herein.

186.   Defendants Londei, Piscitelli, and Suria, by virtue of their positions and relationships with AnaptysBio, had access, directly or indirectly, to material information about AnaptysBio that was not generally available to the public, as described above.

187.   The information described above was a proprietary asset belonging to the Company, which defendants Londei, Piscitelli, and Suria used for their own benefit when they sold AnaptysBio common stock.

188.   These defendants' sales of AnaptysBio common stock while in possession and control of the proprietary, non-public information described above were breaches of their fiduciary duty of loyalty.

189.   Because the use of the Company's proprietary information for their own gain constitutes a non-exculpated breach of the defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits defendants Londei, Piscitelli, and Suria obtained thereby.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of AnaptysBio, and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AnaptysBio;

C.    Determining and awarding to AnaptysBio the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing AnaptysBio and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect AnaptysBio and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4
      1)    A proposal to strengthen the Board s supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board  and

5

6

7
      2)    A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations

8
      3)    Awarding AnaptysBio restitution from Individual Defendants

9

10

11
      4)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys  and e perts  fees, costs, and e penses  and

12

13
      5)    Granting such other and further relief as the Court may deem just and proper.

14

15

**R   DEMAND**

16
    Plaintiffs hereby demand a trial by jury.

17
Dated: April 17, 2021

18
                  Respectfully submitted,

19
                  **POMERANT   LLP**

20

21
                  */s/ Jennifer Pafiti*

22
                  Jennifer Pafiti (SBN 282790)

23
                  1100 Glendon Avenue, 15th Floor
                  Los Angeles, California 90024

24
                  Telephone: (310) 405-7190
                  Email: jpafiti@pomlaw.com

25

26
                  *Counsel for Plaintiffs*

27

28

71

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

OF COUNSEL:

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Daniel Tepper
Correy A. Kamin
Ryan Messina
55 Broadway, 10th Floor
New York, New York 10006
Telephone. (212) 363-7500
Fax. (212) 363-7171
Email: gnespole@zlk.com
        dtepper@zlk.com
        ckamin@zlk.com
        rmessina@zlk.com

*Attorneys for Plaintiff Gary Buchheim*

**SHUMAN, GLENN & STECKER**
Kip B. Shuman
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: 303-861-3003
Telephone: 866-974-8626
Fax: 303-536-7849
Email: kip@shumanlawfirm.com

*Attorney for Plaintiff Bryan Foat*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing.  As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __26__ day of March, 2021.

Gary Buchheim

**<u>VERIFICATION</u>**

I am a plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing.  As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of March, 2021.

Bryan Foat